## The State of Vermont *v.* Peter McDonnell.

*The right of the jury in criminal cases to be judges of the law as well as facts, and the duty of the court in respect to their instructions to the jury as to this right. Confessions. Evidence. Murder. Manslaughter. Criminal law.*

It is not error, in a criminal cause, when the benefit of the rule is claimed that the jury are the judges of the law as well as the facts, for the court to charge the jury, in their own way, that this rule is not intended for ordinary criminal cases; that it is matter of favor to the respondents, and should not be acted upon by the jury, except after the most thorough conviction of its necessity and propriety; that any departure by the jury from the law laid down by the court must be taken solely upon their own responsibility, and that the safer and better way, in ordinary criminal cases, is to take the law from the court, and that the jury are always justified in doing so.

In important criminal trials, when the prosecution resorts to the confessions of the respondent as evidence against him, great care should be exercised by the court, lest, either in the mode of obtaining the confession, or the use made of it, injustice be done to the accused. His whole statement, embodying the confession, should be taken together, and all parts of it, both the exculpatory and the inculpatory portions, should be treated alike, except such as are disproved by the other evidence, or their own innate improbability or inconsistency.

When testimony is admitted upon the representations of counsel that it will be connected with additional evidence so as to render it material, and this representation fails to be fulfilled, the court, in their charge to the jury, should expressly direct them to exclude such testimony entirely from consideration.

The practice of courts of reading to the jury, in their charges to them, abstract legal principles from text books and reports, criticised.

State *v.* McDonnell.

In trials for murder it is the duty of the courts, first, to regard the accused as innocent until he is proved guilty; and, secondly, after he is shown to have committed a homicide, to look for every excuse, which may reduce the guilt to the lowest point, consistent with the facts proved. REDFIELD, Ch. J.

If in a mutual combat arising without previous malice, mutual blows be given before the respondent draws his knife; and he then draws it in the heat and fury of the fight and deals a mortal wound, with the purpose of taking life, the offence is only manslaughter.

But if the design to kill be formed deliberately for ever so short a time before the infliction of the mortal wound, or if it be formed without such provocation as the law regards as sufficient justification for heat of blood and anger, the offence is murder.

If one inflict a mortal wound, with a deadly weapon, upon a vital part, it is a presumption of fact that he designed the natural consequences of his act; and it is murder, unless he shows that the result was not designed, or that the act was done in heat of blood upon legal provocation, or under justifying circumstances.

The charge of the court to the jury in this case held erroneous, (and a new trial granted therefor) because, there being testimony tending to prove a case of manslaughter only, the court neglected to call the jury's attention to it in that light, or to the theory of the respondent's counsel upon the evidence, indicating that it was manslaughter and not murder, and omitted to inform the jury of the distinction between murder and manslaughter, except in a few abstract remarks, unaccompanied by any application of them to the facts in the case.

INDICTMENT against Peter McDonnell, John Bain, and John Kelly, for the murder of John T. McKeen. Plea, not guilty, and trial by jury, at the September Term, 1859,—BENNETT, J., presiding. The jury rendered a verdict of guilty as to McDonnell, and not guilty as to Bain and Kelly.

The court having allowed the respondent to except generally to the whole charge of the court, without requiring him to specify at the time any particular exceptions, it is material to detail the whole testimony given on trial, and the whole charge of the court, so far as the respondent McDonnell is in any way concerned. The witnesses testified in substance as follows:

Henry M. Wight, a witness for the State, testified: I reside in Burlington and have for two years past. I was acquainted with John T. McKeen, and was connected with him in business from May, 1858, to within four weeks of his death, in the har-

ness business, on the west side of Church street, in the building occupied by Ferre's shoe store, right opposite Fath's saloon, which was back of Prouty's shoe store, with an avenue between Staniford's and Prouty's leading to the saloon. The sidewalk in front of Ferre's shoe store from the door step to the outside of the walk is ten feet and eight inches, and the step is seventeen inches wide. There is one step between the threshold and the sidewalk. The breadth of the front of the store is eleven feet and nine inches, and extends from Warner's on the south to Brinsmaid's on the north. The door is near the north side of the front, the balance is a window, and there is a glass over the door.

I was in the store on the night of May 21, 1859, after half-past six o'clock. It was my place of business. The door was closed about nine o'clock, and I think was locked. The window shutters were also closed.

There was no blind over the window over the door. This window consisted of three panes of glass, say a foot high, and extended the width of the door. When the store was closed Mr. Ferre, Leonard Bliss, Logan, McKeen, Mr. H. E. Howard and myself were there. McKeen's family were at that time in Hinsdale, N. H., and he slept in Brinsmaid's building, which was adjoining the store.

McKeen was about one hundred and fifty pounds weight, and about thirty-five years old.

I did not leave the store until the death of McKeen; Ferre left upon closing the store; Howard left at about ten o'clock, and the others remained until the death of McKeen. George Hagar came in at about the time the store was closing and left. No other person came in.

We were playing whist in the back part of the store, Logan, McKeen, Bliss and myself, about thirty-eight feet from the door. We had one fluid lamp only, which stood where we were playing.

I was boarding at Bliss', and Logan also, on Bank street. About twelve o'clock some one came to the store door and made some noise on the door, shook it a little and said something through the key-hole which I could not understand. I think he put his hand on the door, but only once.

I had heard no noise in the street before, and there had been none in the store.

McKeen got up immediately and went to the door.· He was sitting with his hat and coat off; he did not put them on when he went to the door.

Logan went next after, then I followed. McKeen got up to the door first, but I think not more than two feet before Logan.

I went before Bliss. I had got one-third of the way to the door when McKeen got there. Bliss got to the door very soon after me. I can't say how long. Bliss had not started from the table when I left; he got to the door a few seconds after me. I went directly to the door. McKeen opened the door and stepped on to the step and stood there to the right of the center of the door on the south. Logan passed out on to the step and stood on the right or south side of McKeen, about two feet from him.

I stepped on to the step on the north side of McKeen; Bliss stood in the doorway. I heard no conversation from McKeen before I got to to the door.

When I got to the door I saw three persons walking down the street from the north, on the sidewalk, on the same side with the store. These persons were about ten feet to the north when I first saw them. Two of them were rather short and one considerable tall; they were walking slow. I heard no conversation between them while they were approaching; they were nearly abreast.

The tallest one was inside the walk and next to the shop; one of them stopped nearly in front of the shop. The others didn't stop until they got a little below where McKeen was standing. One of the short ones stopped first. It was about two or three feet below that the others stopped. I did not know the persons,

They were walking down when I saw them first. When the conversation commenced, McKeen asked them what they were around there for. They made no reply. He then asked them which it was that came to the door; this was said after they had stopped. The one who was standing nearly opposite replied "suppose it was me, what are you going to do about it?" He was then standing about six feet from McKeen, and facing him. McKeen asked him what he did that for? He replied "I don't

know as it is any of your business, you damned son of a bitch."

McKeen asked him what was that he called him, or what he called him that for, (can't say which.) There was no reply made to this. Immediately upon this McKeen stepped down on to the walk from the step about two steps. This short man advanced at the same time that McKeen stepped off the step, and they met about half way from where each was standing. They came together and had some sort of a clinch, (could not see how they had hold of each other,) and immediately began swaying toward the door, and both fell partly behind me and partly on the step. I heard the fall, but did not see them fall. I had stepped on the walk about two feet from where I first stood. My attention was drawn to the other two, standing a little below. As they were falling, my attention was drawn to them by an exclamation of McKeen. McKeen when I first saw him after the exclamation, was, on his back, with his feet on the walk and his shoulders on the steps, his feet standing a little to the south. McDonnell was bent over him, with his hands resting on McKeen's shoulders, and his feet or knees resting on the walk, I can't tell where McKeen's hands were.

While McKeen was falling McKeen said, "Take the bugger off, he is knifing me." I was at this moment looking at the others. This is the last he ever said.

The others stood, the short one about twelve feet below and south from me, on the outside of the walk. The tall one was near the building, south of me, about ten feet from where I was standing, and the two were five or six feet apart.

When I heard the cry I turned around and took the man off of McKeen. As I was doing it, the tall one stepped up towards me within reach, made no stop, but immediately turned and ran.

The other two started and ran down the street; I think the man I took off started first a very few seconds. They went south. I did not pursue them. The man made no resistance to coming off. He did not seem to have hold of McKeen in any way.

When they fled McKeen was lying on the steps. I raised McKeen up and carried him into the shop and laid him on the floor. He gave no assistance. It was not over two or three

minutes after they fled before all signs of life ceased. He was afterwards (in three or four minutes) placed on the counter.

McKeen stepped from the step quick, and the short man advanced with quick step. McKeen faced me as he was advancing. His hands were raised as I stood behind him. I am not certain that I could see his hands, but think I could. I think his hands were raised about as high as his elbows; the witness here illustrated the position of McKeen's arms and hands, showing the elbows in a natural position. As they were approaching I could not see the position of the other's hands. I did not see the hands of the short man before they fell. I saw no effort on the part of McKeen to strike.

The time between McKeen's leaving the step and the fall was less than one minute. I can't state the exact time. It was done very quick. It was quite dark. There was no light but the fluid lamp which stood in the back part of the store. The door was open. I was at the same shop in the early part of the evening the Saturday before.

I saw no blows struck after the parties fell to the sidewalk. After the exclamation of McKeen my attention was directed partly to the two south of me and partly to McKeen. It was less than half a minute after the exclamation before I took him off.

I can't say how near down they were when I heard the exclamation, for they were behind me.

*Cross Examination.* — I immediately turned around when I heard this exclamation, and saw McKeen on his back and the man over him. I turned around as quick as I could. They were down then. I heard the fall immediately after the exclamation. I heard them fall before I turned around. There was hardly any time between the exclamation and the fall. There is a counter on the south side for from half to two-thirds the length of the store. We were playing upon a box set on end. I sat with my back to the door. Logan sat opposite me, McKeen on my right, and Bliss on the left of me. The light was set on the box. The box was about in the center of the store crosswise. I don't think the door was shaken very hard. I am sure the door was shaken. I think I heard but one remark at the door before we went out, but could not understand it. It was loud enough to be heard

distinctly.    McKeen got up immediately, but no remark was made by any of us on the inside; he walked pretty quick, but not very rapid; he made no remark on the way to the door. Logan started next.  I think he said nothing, but started and walked quick.  I started next, and then Bliss.

I was a witness before the coroner's jury, I stated then that I started *next* after McKeen.  I was mistaken, don't know how I made the mistake.  Knew very well it was Logan who went next.

Was twice called on there.  I can't tell what made me make that mistake.  I was twenty or twenty-five feet behind McKeen when he got to the door.

I think McKeen first said "what are you doing out there?" He did'nt make that remark until I reached the door.   I didn't state before the coroner that McKeen said this as soon as he stepped on to the step.   I can't say whether I stood in the door-way or on the step when I heard this.   I didn't say there was no reply.

McKeen then said, "which one of you came to the door?" not "which one of you hollared through the keyhole."    Next was that one of them said " suppose it was me," etc.   Then Mc-Keen asked him what he did that for?

Before the coroner's jury, I think I did say McDonnell said something like "son of a bitch," or some such expression; I can't now say what expression was used.  Did not use it in connection with the saying that it was none of his business.   *Was* in connection with the expression that it was none of his business.   In answer to McKeen's question, what he (McD.) did that for?  McDonnell said "none of your business, you damned son of a bitch."

I have since read the printed report of the testimony.   When McKeen was stepping down the step, McKeen said, "what is that you call me?"   The short man stood six feet from the step, and McKeen stepped two steps.   I couldn't see how they came together, as it was very dark, and McKeen's back was towards me.   They had some kind of a clinch.   I saw them meet, but couldn't tell how their hands were.   I saw their bodies come together.   I don't recollect any remark from Logan.   He stood about five feet from me.   I was probably a little excited.

33

I did not turn around immediately after their bodies came together. Their bodies were together as they swayed towards the steps. It was about half a minute after they came together before I turned around. When I turned around I was nearly facing the door, a little to the south.

I can't say whether I stated before the coroner's jury, that it was about two minutes after McKeen left the step before he fell.

I think now it was not two minutes, but less than a minute. Might have said before that it was less than two minutes. I can't say.

I think I did state before the coroner that I heard the exclamation before he fell. Don't know as I did state that I heard the fall after the exclamation. It was about the same time. McKeen spoke very quick, as if in pain, or scared. It was a sudden exclamation. I never knew of any controversy between McKeen and the respondents. I only knew Kelly. I don't know as McKeen knew either of them.

*Leonard C. Bliss,* for the State,

I was acquainted with John T. McKeen for a year or a year and a half before his death. I do not know the respondents. I went to McKeen's shop about nine o'clock, P. M., of May 21, 1859, at the time they were closing up, and remained there until after the death of McKeen. Soon after Ferre went away, young Mr. Hagar and Alger came in, and went away soon. McKeen, Logan, Wight and myself were playing whist.

Some one came to the door between eleven and twelve o'clock and rattled; made some noise on the door and spoke through the keyhole. I could not understand what was said. I heard a voice. Soon after this noise McKeen got up, and Logan and Wight and I started about the time McKeen opened the door. They went to the door in the order stated by Wight in his testimony. I heard them speak before I got to the door. McKeen wanted to know what they were about there for. I heard no reply. When I got to the door there were three persons a little above (north) of the door, on the west sidewalk, coming down; they could not have been more than ten feet off. They came opposite to the door, and McKeen spoke and wanted to know which of them was pounding on the door and speaking through

State *v.* McDonnell.

the key-hole. One of the party stopped (a shortish fellow) and the others passed by. This one who stopped said, "Suppose it was me, what are you going to do about it?" McKeen spoke again, and wanted to know why, or which one was pounding on the door or speaking through the key-hole. The answer was, "Call it me, you son of a bitch," or something like that. McKeen stepped down and wanted to know why he called him that. As McKeen stepped down this man approached, and there was a clinch. I saw no blows, and they fell. McKeen had no coat or hat on. This man was five or six feet from McKeen when he stepped down. McKeen proceeded one or two steps before they met. They came together pretty quick. I hardly know which stepped quickest but should rather think the man did. I did not see McKeen use his hands, until in falling, I saw him put his hands rather around McDonnell's shoulders, as if to save himself from falling. When they met they were two or three feet from the steps. I did not see the motion of the hands of the other man. McKeen was between me and the other man. I was standing on the door in the threshold.

They fell with their heads towards the door, where I was standing, and I think McKeen's left shoulder struck first on the step; he struck a little sideways, his feet a little down the street. I think the other man fell on his left shoulder, a little on the steps and rather over McKeen. I won't be certain that he struck the steps. I can't say that I saw McDonnell's hands. I can't say whether after McKeen had struck the steps or before (it was so quick) McKeen said "take the bugger off, he is knifing me." Mr. Wight then took hold of the man, and I went back into the back part of the store. I came back very quick and found Wight was lifting up McKeen, and I saw them running, and I and Logan followed them to Hagar's corner, and saw them running down towards the lake. I returned to the store.

When McDonnell and McKeen met, the largest one of the three we found on the outside, stood near the store, some six or eight feet from the door, and the other boy outside of the walk, ten or twelve feet from the door. When Wight went to take hold of McDonnell the largest one started up the street toward Wight. I think McKeen's hands were by his side when he left the steps.

I heard no observation from either of the others. It think it could not have been half a minute from the time McKeen left the steps before he fell on the sidewalk.

When I returned to the store, after pursuing the three, McKeen lay on the floor of the store. McKeen was then alive, and I said " he is a dead man," and I ran for Dr. Thayer. The knife was found before I got back from the doctor's. I don't remember any other language from McKeen except what I have related.

I saw no blows struck by either party, nor heard any at any time. As McKeen was falling he clinched hold of McDonnell rather to save himself. I thought. It was but a very few seconds after they met before they fell. I saw no use of the feet while they were up.

*Cross Examination.* I was a witness before the coroner's jury. I don't know whether I testified that *after* they fell I heard McKeen say " Take the bugger off," etc., either in direct or cross examination. I don't remember, I can't say now whether it was just before or after he struck the steps. I was looking right at them.

Before the coroner I think I did not testify that" he had his hands raised. I can't remember how I did testify. I think I did not, in conversation with Chittenden the other day, describe his hands as raised. I think I have testified that they fell on their sides. I don't know whether I testified that they fell side by side, and McDonnell rather rolled over him. They fell sidewise and McDonnell was instantly over him, soon after they went down.

When McKeen got to the door I was about starting. I heard nothing said before McKeen started. Right in front of the door the light shone out so that I could see. The clinch was a little below the center of the door, but some part of it in front of the door. I heard their feet, but no great noise.

I think I did testify that McKeen asked " What are you rattling on my door for," at some time, but I can't say this was the first remark.

I don't remember the remark of "*sail in.*" Can't say that I testified that they came down on their sides. McDonnell was standing five or six feet from the step, about midway of the side-

walk. I went to the store about nine o'clock, and began to play about ten o'clock. Coburn was in there and left about eleven o'clock.

*Wm. H. Logan*, for the State.

I knew McKeen for nine years. I do not know the respondents. I was occupied in the store. I was in the store on the night McKeen was killed.

About twelve o'clock some one came to the door and made some noise, like taking hold of the latch, and spoke and said something. McKeen got up quite soon and went to the door and opened it, and I followed, and the rest. I was directly behind McKeen, the rest followed in a few seconds, a couple perhaps. McKeen stepped on the step and I stepped to the south side of him on the step.

When I got out I saw three persons north of me. I did not know them. Some words passed between the parties. McKeen inquired who was there, or what they were doing? They were then up the street and seemed to be standing still. They made no reply. They commenced walking back, and proceeded opposite to us. McKeen inquired again who it was that came to the door. The tall one said " Say it was either of us," or something of that kind. One of the others said " Suppose it was me for instance," and inquired " what he was going to do about it, you damned son of a bitch." This was McDonnell. He was standing near the middle of the sidewalk, opposite McKeen, a little outside of the middle of the sidewalk.

McKeen inquired what he called him, and McKeen stepped forward and the other stepped forward towards him at the same time. They clinched, or appeared to clinch, and fell shortly after.

McKeen went half way between the two; they stood six feet apart. I can't describe the position of McKeen. I think McKeen was not bent.

They fell in a minute, perhaps half a minute. McKeen fell with his head towards the steps and lay on his back. After they fell the other was bent over him and pretty close to him. I don't know where their hands were as they approached.

I can't say how McKeen's hands were when he started to meet McDonnell, nor how McDonnell's hands were. I saw the right

hand and arm of McKeen, and left hand and arm of McDonnell, and around their bodies. McKeen's back and side were partly towards me.

As he was falling he exclaimed "he is knifing me, take him off." It was within a minute certainly, perhaps less, perhaps half a minute after they started together before they fell. After this exclamation of McKeen, the tall one stepped towards McKeen and then they all left. I can't say how near he came, perhaps two feet. I followed them for say half a minute, and then came back, and McKeen was then inside.

I saw no blows struck by either of the parties. After McKeen fell I think his hands lay beside him.

The Saturday night previous I was in the store playing whist, Howard, Coburn and McKeen were there. Some one came to the door a number of times. There was more than one person. They first came about ten o'clock, and hallooed at us and called us some names.

They wanted to know what we were doing there, and what was trumps, etc. They stumped us out to fight, and said if we would come out they would lick us, or something of that kind. This lasted three or four minutes. Was silent a while and they came again. The second time they spoke again and called us something, and wanted to know what that little white headed fellow was doing, and would tell Brinsmaid of him. I think they came again, I am not sure.

The second time they came and stumped us, McKeen went out, and I behind him; I did not see or hear any one, and went back.

After we went out they came again. They said (I think) if we would come out they would lick us, or something like that. McKeen said they would run again. They said they shouldn't.

I believe at one time they called Mr. Wight's name. There were other replies made within, but I can't state what they were.

These visits were fifteen or twenty minutes apart. McKeen boarded at Stanton's, i. e., took meals, but lodged up stairs in Brinsmaid's building.

I saw Wight on the steps shortly after he came to the door. Wight was on the step when McKeen made the first remark.

They were then about twenty feet north of us. They were standing then.

They came down about opposite and one stopped there, and the others passed a little. I stood on the south side of McKeen, and Wight on the north side.

I heard McDonnell make some such remark as " well, sail in then." This was in reply to something McKeen said, but what it was I don't recollect. This was before McKeen stepped off the step, a few moments before, may be half a minute.

I don't recollect as McKeen said anything in reply to that. I think McKeen did say after this, what was this he called him, and immediately stepped down the steps, and I think they were clinched and had hands around body.

I don't think I turned around. My eyes were off them for a short time. I was looking at the others, and Bain was stepping up. I told him to step back and see fair play. He did stop. I don't know what McKeen and McDonnell were doing, but they appeared to be clinched. Bain made no reply to this. I then looked around as McKeen spoke and made the exclamation, at that time or about that time. I did not see them doing anything after I turned around.

I was examined before the coroner's jury, but don't think I said he made the exclamation after they fell. May be while he began to fall a part of it and part after. I don't think it was after he fell. I don't know as I testified that McKeen started first. Think they started about the same time.

I don't think I can state which started first. It was not a very quick expression and didn't make me think that he was very much injured.

I was twice examined before the coroner's jury. I don't know as I testified that Bain made any remark then; I don't remember that I did. I meant to state all I remembered. I don't know now as I then remembered it. I have talked with Bliss and Wight about the circumstances. I have spoken with Hard about it, but can't state what. The last time was the day before yesterday in the store. Wight was behind us.

I think I did testify that near the time I saw them falling I turned to Bain.

I can't say that it was the precise time that I saw them falling that I turned to Bain and told him to stand back, etc.   Don't think I saw McDonnell and McKeen after I had made this remark until after they had fallen.

I don't remember where I was looking when I heard the remark " he is knifing me."   I don't remember whether the exclamation was before or after I made the remark to Bain; they were made about the same time.   I did not hear them fall.

I guess I saw them falling.   I don't remember as I was looking at them the moment of their falling.   I don't remember how the parties were located at the play the Saturday week before.

I can't say how often we were accustomed to play there.   I don't remember as we played any that week except as stated.   I don't remember of persons coming to the door at other times. Last night the key-hole was stopped.

One could raise himself up and look over the door.   I heard no one attempting this.

I don't know as the other short man said or did anything.

*Dr. Samuel W. Thayer, Jr.*, for the State.

I am a physician and surgeon.   I made a post mortem examination of McKeen at the shop of Mr. Ferre.   There was an incised wound in front of the thorax or chest, and a slight bruise on the left shoulder.   These were all the marks I saw.   The wound was in the breast bone, at a point between the 4th and 5th ribs, a little to the right of the median line entering the cavity on or slightly to the left of the median line.   The direction being from below upwards, and from the right to the left.   It extended into the cavity about three inches from the skin and reached the upper side of the heart.

(Here the witness inserted the knife in the breast bone of the deceased, which was produced, and the position of the knife shown.)   The edge of the knife was to the left.   The knife was found upon the floor near the body of McKeen.   This bone is quite firm and strong, about a quarter of an inch in thickness or a little exceeds that.

This is the last bone in the system that becomes solid, but solidity takes place at maturity usually.   This is quite a firm bone. It requires considerable force, a good deal of force, to make this

wound. I don't think that the wound could be made while standing and in contact by a direct blow given in the ordinary way.

*Question by State's Attorney.* How must this blow have been given if the parties were standing?

*Answer.* Supposing that the parties were standing, it was given back hand from left to right, at a sufficient distance from each other to allow full play to the arm, or the knife was held in the natural position and the parties rushing upon each other; i. e., if the instrument passed its length at one stroke, it might have passed part way with a slighter blow.

This is a part of the heart, in this bottle, that was perforated.

As I was examining McKeen a young man stooped and picked up the knife on the floor, between the angle of the counter and the door. Moist blood was on the knife.

*Cross Examination.* Death would almost instantly ensue; the person might possibly utter a word or two, might respire once perhaps. I would not say a perfect respiration. The person would be no more likely to feel this wound at the time than a bruise.

I think this wound would be felt, at the time, immediately. There was an important nerve wounded, the internal respiratory called the phrenic nerve, a nerve of motion, this would be severed. This would render the muscles of the chest paralyzed. It would impair respiration, but not entirely prevent it.

The immediate sensation would be that of suffocation; after such a wound a person could not struggle much. I should expect immediately an exclamation of pain, (after such a wound) faintness and death. From the character of the knife, the direction and extent of the wound, my inference would be that the instrument went through the skin and fastened itself into the bone while the parties were standing either erect or bending, and that it went through and to its destination when they fell. If the person were falling on his left shoulder it would bring the heart nearer the sternum than in any other position.

There is no certain indication that the skin was penetrated while they were standing. It would seem to be so from the direction of the wound.

If the party was down and the accused stood over him it would

give it this direction.    There is nothing in the wound inconsistent with the idea that the knife penetrated the skin while the parties were in contact and while the victim was bent forward.

This is a very clean cut.    I should think that there was not much struggle after the wound was received.    I should think there was not any, if the parties were clasping each other, instantaneous relaxation would follow.    The knife would be held somewhat firmly in the wound.

I think the probabilities are that the extreme penetration occurred when the person lay on his left shoulder upon the ground.    The knife might have pierced the skin when the parties were in contact and the person *stooping.*

*Dr. Edward Bradley,* for the State.

I am a surgeon, and aided in the post mortem examination of McKeen.    I took from the body these parts, the sternum and a portion of the heart.

This bone is a very firm one and is fully ossified, and it would require a good deal of force to go through it.

*Horace E. Howard,* for the State.

I live with J. E. Brinsmaid, the jeweler, next door north of McKeen's.    I was quite well acquainted with McKeen.    I am somewhat acquainted with Bain and McDonnell.    I had heard them speak often before this, in meeting them.    I have seen them often.

I was in the shop on Saturday night, the 14th of May.    I went in a little after nine o'clock and remained there until between ten and eleven o'clock.    We were playing whist in the fore part of the evening, Logan, Wight, McKeen and myself; Coburn was also there.

All of us four were engaged in whist.    Between half-past nine and ten o'clock some one came to the door and put his mouth to the key-hole and said " What the devil is trumps," or " What are you doing there," or something to that effect.

I think there was no answer made.    They stepped up again and appeared to be looking through the key-hole and said " Go home, old tinker, or I'll tell Brinsmaid.

They stayed, and we could hear them talk, and I thought there were three or four there.

Again some one took hold of the door and shook it. They shook it pretty hard, and McKeen said if they wished anything to come in, if not to go away and let the door alone. One said, in effect, "By God I shan't go away, and if you think you can help it come out and try it." These might not be the words. I can't say whether there was a reply or not. Then they said "you dursent come out." Then they went away.

In fifteen or twenty minutes they returned and came on to the steps, and shook the door and stamped on the steps. I think then they asked if we had got ready to come out of the store. I think McKeen spoke and said they had better go away and stop their noise. Some one said to this "Come out and by God we'll fix you." The second or third time they came (I think the second time) McKeen went to the door. Then they went away.

I think the second time they were there McKeen said "I'll go to the door and see what they want," and Logan started at the same time. McKeen went to the door and they ran; I saw one good sized person and one smaller person pass the door, and afterwards heard three or four persons running into the alley way. I think McKeen said at the door "What'll you have." I heard no reply, but they ran. In five or ten minutes after this they came again (for the third time) and stamped on the steps and made a noise, (I think on the door) and said "Damn you, you dursent come out, and if you come out now we won't run again." They said they would knock him or any of them that would come, they would'nt run for any of them.

They dared us out a good many times. I think they were there four or five times. They would stay fifteen or twenty minutes each time, threatening and using profane language.

We went to bed a short time after this. I heard two or three voices, two certainly. I saw a man running; he was about the size of Bain. I was certain that the first one who spoke was Bain. I could'nt say as to the other. I think I heard Bain's voice at nearly every visit.

I think just at dark I saw Bain and McDonnell together on Lyman's corner, but would not be positive. I think I saw them but once that evening.

*Cross Examination.* McKeen had occupied the building about

State *v.* McDonnell.

a year. He worked up stairs, and down stairs during the winter. He had a bench down stairs; he had goods above and below. McKeen worked below and his partner above.

We began to play at about half past nine o'clock, and played perhaps an hour, but not until we went to bed. I think we were talking towards the last of the rattling, but am not positive. I can't be positive whether I went out after the store was shut up. I don't recollect of going across the street, or into Fath's. Don't know that any one went over there. McKeen slept with me most of the time, and slept with me that night. I went to bed at half past ten or eleven o'clock. I judge it was as late as that.

We were playing clear at the west end of the store. I did not go to the door. We had a small fluid lamp. It was middling dark, pretty dark; I think I could see the shadow of a man as he crossed the street so as to distinguish him.

There was a light in Fath's saloon.

I was sitting on the north side of the table in playing. When they spoke of the tinker, I think I said "Guess I would'nt be in a hurry." I think McKeen smiled. McKeen went to the door either the second or third time they came. I can't say whether he bolted the door. Logan was there all the while.

I was in the store on the night of the homicide at about nine o'clock, and staid as late as ten o'clock or later and went to bed. There had been no disturbance at that time. I went to bed directly over Brinsmaid's store.

I was in quite often of evenings, occasionally playing there, but not regularly.

The step is twelve or fifteen feet in length; some nights in summer while the band is practicing, folks sit on these steps. The band practices right opposite. I think it was not a place of resort at this time. It was not very cold then and the band practiced there, but they did not practice as late as this. They sometimes play as late as ten o'clock. They might have begun to practice late in the spring, say June.

*Henry Brown,* for the State.

I know Bain and McDonnell. I lived in town at the time of McKeen's death. I passed Ferre's store Saturday night of the week before. I can't state the hour, it was pretty late. It

might have been half past nine, ten, or eleven o'clock at night.

I saw Bain and McDonnell sitting on the steps between War-ner's and Brinsmaid's. They spoke to me and I went to them. I spoke a few words with them. I spoke in a friendly manner, nothing particular said. One of them hallooed something, and I said " I guess boys you had better stop, you may get into a fuss, you had better come now," and they did come away with me. I can't say which it was that made the noise. One of them was sitting and one standing. I think Bain stood beside me and the other was sitting. It was so dark I could hardly see my hand. I heard no more noise whatever. Only one of them made the noise and this was not loud or sufficient to make any disturbance. It was just before the door. His back was to the key-hole. He turned round and put his mouth pretty near the key-hole. I went home to bed. I could see no light. I have never spoken a doz-en words with either of them, but know them by sight. The stores in the neighborhood were closed, but I saw lights in Fath's saloon and in the Band room. I invited them to go in and drink beer. They refused and I went home.

*Cross Examination.* I believe I shook hands with one of them. I know Edgell's son by sight. I don't think it was Edgell, I can't swear it was McDonnell.

*Direct Examination.* I can't say that I spoke with more than one of them. They stood about the distance from me to that partition, (which is, say, four feet.)

*Harmon Ray*, for the State.

I am acquainted with the prisoners. I saw McDonnell and Bain together on Saturday evening between half past eight and nine o'clock, May 14th, on College street, between the apothecary shop and Lyman's store. I had been to the post office and was returning; the post office was shut. I saw them only at that time.

The prosecution then offered one Mosher as a witness, and upon being called upon to state the matters to be proved by the witness, the State's attorney stated them as hereinafter detailed in the direct testimony of said Mosher, and stated further, that he expected by that testimony, and other testimony as to the resemblance between McKeen and Mosher, to satisfy the jury

that the attack made upon Mosher (as hereinafter stated) was made by the respondents upon their supposition that Mosher was McKeen.

To the introduction of this testimony the respondents objected, but the court admitted the same, and Mosher testified as follows:

*Mosher's testimony.*

I knew McKeen. On the night of Saturday, May 14th, I passed down Church street on the east side. I think it was before eleven o'clock. I stopped for a moment in front of Prouty's store; I heard three persons under the awning on the west side of the street, near McKeen's, muttering, and saw three persons cross from the opposite side. If they were not under McKeen's awning they were under Warner's.

There was a difference in their sizes. One was about Dr. Bradley's size; the smallest one was about as large as the McLane boy, who plays in the band. The medium sized one was about as tall as McDonnell, but not as large. I heard one of them say "There goes the damned son of a bitch now." They were then on the west side of the street and coming over from the sidewalk. The remark seemed to come from the largest one, who was behind the other two.

They stepped from the edging stone on the opposite side of the street and approached me as they made the remark. I then started on a rapid walk south. There was a light in Fath's saloon which shone across, and there was a man coming out from Fath's who turned back immediately. Supposing it was he to whom they referred, I did not hasten, but as I got near to Staniford's door the smaller one passed me at my left, and the medium sized one passing on my right stopped in front of me. The one who stopped on my right made a pass to strike me; as he struck I warded off the blow, and his blow passed just over my shoulder; and then I struck him and he reeled or fell. I then ran and locked myself in Roby's store. I heard them pass me there. They passed up College street and I heard them come back up Church street again. After they had passed I went to Reynold's saloon.

I think the largest man had got half way acros the street, nearly opposite, when the others met me. I have never had any

difficulty with either of these respondents. I knew Bain by sight, but not these others. The night was so dark that persons could not be seen under the awning across the street, but the form of a person could be seen when in the open street. (As to these localities, it is admitted that Fath's saloon stands back from the east side of Church street, nearly opposite Ferre's store, an avenue leading to it from the street; Prouty's store being on the. street on the north side of the avenue, and Staniford's store on the south side of the same; that the band room was over the saloon, and that the place from which Mosher had come, in passing down the street, was some or ten or twelve rods north of this avenue.)

*Cross Examination.* The witness was requested to look upon the respondents and say whether they, or either of them, were the three persons who were spoken of in his direct examination. The witness looked upon the repondents and made answer as follows:

When these persons were pointed out to me yesterday, I felt convinced that neither of them was one that I saw that night, and I am still of the same opinion, that they or not the ones. The smallest one was a great deal smaller than either of these. The tallest one was not as tall as Bain, and heavier. The medium one was about the size of McDonnell, but taller. I said the other day when these men were pointed out to me they were not the men. The smallest one was not as tall as Kelly. I am always up quite late at night. My weight is about one hundred and thirty-four or one hundred and thirty-five pounds. McKeen was a much heavier man than I, and more square shouldered.

*Direct Examination.* There is an awning all the way on the east side of Church street. McKeen's whiskers and hair were very black indeed; mine are light.

Without other evidence of the identity of the respondents with the persons who attacked Mosher, the prosecution then offered to prove that there was a resemblance between Mosher and Mc-Keen in their motions, gait, hight, fashion of whiskers, etc.; to this testimony the respondents objected, but the court admitted the same. Upon this point the witnesses for the State testified as follows:

*L. C. Bliss.* I am acquainted with Mosher. I think Mosher is about the same hight as McKeen, and in gait and motion

resembles him a good deal. McKeen walked quick. McKeen's whiskers were about the same kind as Mosher's; his chin was shaved.

*Cross Examination.* I can't say whether McKeen wore a moustache. His whiskers came on his face more than mine. McKeen was a strong built man. I think he wore a sack or frock coat; he generally wore a hat. Have seen Mosher wear a drab coat. He generally wears a cap. Don't know whether he wore a hat or cap in May, 1859.

*Noble B. Flanagan.* I was acquainted with McKeen for about a year, and saw him almost every day. I have known Mosher about two years, and saw him often.

McKeen was heavier than Mosher by twenty-five or thirty pounds; he was a very little taller, and wore whiskers clear around his chin, as Mosher wears them. McKeen was a very quick motioned and energetic appearing man. Mosher's and his motions are alike, and I should think their gait was alike.

I knew Bain before his arrest, and Kelly. I did not know McDonnell before his arrest.

Bain and McDonnell both lived on Maiden Lane. Kelly lived nearly opposite Stanton's, on Church street. The most direct way to their home from Fath's would be up Church street, on the east side.

*Cross Examination.* I think McKeen weighs between one hundred and fifty and one hundred and sixty pounds. Mosher has usually worn a full beard formerly. I can't say whether McKeen wore a moustache. I can't say whether his chin was shaved at the time of his death. His beard was dark, but not black. His whiskers were curly and were kept carefully dressed.

*William Brompton,* for the State.

I was at Fath's saloon that night, May 21st, between nine and ten o'clock I think, and staid there until the murder was committed. The three respondents came after I did. I guess they came together. I believe I was there when they left. I think they left between ten and eleven o'clock, but can't say. They were drinking beer, playing bagatelle and smoking. They did not mingle with the rest of the company. I can't say where I was when they left.

*Samuel Johnson*, for the State.

I was at Fath's saloon Saturday night, (May 21st) and left at about twenty or twenty-five minutes past twelve o'clock ; it might have been later. I saw McDonnell, Bain and Kelly. I did not see them go out, but they left before I did. Bain asked Kelly if he had a cigar, and they went to the bar and got one. McDonnell said, "let us go over and see what he has to do (or say) for himself." This was about eleven o'clock. McDonnell turned to Bain. Bain said, "no, let it go." McDonnell called the name, but I can't say what name. He did not say where the person was. I can't say how long after this they left.

*Cross Examination.* When I came out of the saloon I saw Flanagan, and he inquired if three persons had been in there within twenty minutes. This was an hour, or an hour and a quarter, after the remark of DcDonnell.

*Selding Patee*, for the State.

I had a conversation with McDonnell about the killing of Mc-Keen, on the morning of the arrest. I was in the jail to prevent them (the prisoners) from talking together. After talking with the other prisoners I talked with him. They were kept separate.

McDonnell said they were in Fath's grocery that evening, and came out and passed over to the door on the opposite side of the street, and Bain looked through the key-hole and asked them what they were about, and what the devil was trumps. Then McKeen came to the door, and asked them what they were doing, and who shook the door. Mc Donnell says, "what if I should say it was me, for instance."

McKeen says, "you ought to have your face kicked off, you whelp." McDonnell replied, "sail in you son of a bitch." Mc-Keen then made a pass at him. "We then clinched; I backed him on to the steps, and as he fell I knifed him." I asked him why he did so ? and he said, "he struck me, and I was'nt going to be licked." I then asked him when he took the knife out ? He said, "when he made the pass at me." I asked him if he ever had any trouble with McKeen, or any hard feelings ? he said he had not. I then asked him how it happened, and what it grew out of ? and he said, "he didn't know, it grew out of nothing."

State *v.* McDonnell.

He then became very much excited, and I left him.    McDonnell said nothing about falling on the knife.

*Cross Examination.* I think he said that when he came out of Fath's saloon he saw a light across the street.

I heard Bain's story first, then Kelly's, then McDonnell's.

The statement taken down by me from DcDonnell was not of the transactions previous to the clinch.

*G. G. Benedict*, for the defence.

I know McDonnell.  He was in our employ for three years and two or three months.  He was an apprentice for us, in our printing office for three years, and was then employed by us as a journeyman printer.  I was not at home at the time of the hom·icide.

I think I have seen this knife before.  It resembles one that I have seen about the office, belonging to McDonnell.  McDonnell was a pressman, and had occasion for a rather stout knife, and I have seen it on the press, and about the office.

*Cross Examination.* I can't say how long he had the knife before the homicide.  I think he had used such a knife, or a large knife like this, for two or three years, perhaps all the time.

It was conceded by the respondents on trial, that McDonnell, Bain and Kelly were the three persons who were upon the outside when McKeen went to the door on the night of May 21, 1859 ; that the knife that was picked up from the floor shortly after McKeen's death was McDonnell's knife ; and that the fatal wound was inflicted by the hand of McDonnell with said knife.

Upon this evidence the respondent, McDonnell, requested the court to charge the jury among other things :

1. That in order to constitute this act of killing, murder, the jury must find that it was done with malice aforethought.

2. That it was done with a formed design of doing mischief, and without sufficient provocation.

3. That it was done willfully and without sufficient provocation.

4. That whether or not the act of killing was committed with malice aforethought is a question of fact for the jury, to be determined from all the evidence in the case.

5. That if, upon the whole evidence, the jury have any reason-able doubt that the killing was committed with malice afore-

State v. McDonnell.

thought, they should acquit the respondent of the charge of murder.

6. That if the jury find that McDonnell, without a previous intent or intentional preparation to kill McKeen, drew his knife after a fight commenced between them, by a blow from McKeen or mutual clinch between them, and then, in the heat of passion, McDonnell dealt a fatal blow with the knife, the jury should not convict him of murder.

7. That if the jury find that McDonnell, without a previous intent or intentional preparation to kill McKeen, was attacked by McKeen, and was struck by him and a fight ensued between them, and thereupon McDonnell, in the heat of passion, drew his knife and dealt McKeen a fatal blow, the jury should not convict him of murder.

8. If the jury should find that McDonnell, without a previous intent or intentional preparation to kill McKeen, while they were engaged in a mutual scuffle or fight, drew the knife with the purpose only of inflicting a wound not fatal, but in the scuffle the parties fell and McDonnell accidentally fell upon his knife, which was thereby thrust home so as to make a fatal wound, the jury should not convict him of murder.

II. As to the admission of McDonnell, as testified to by Patee, introduced by the prosecution :

1. That the whole of that admission must be taken together.

2. That the same must be taken as evidence in favor of McDonnell, so far as the same, or any part or parts thereof, are statements in his favor.

3. That the jury ought not to find to the contrary of such statements unless they find the same disproved by the other evidence in the case, and that if there is no evidence in the case incompatible with such statements, the same must be taken as true.

The court declined. so to charge the jury, any farther than as embraced in the charge hereinafter detailed, but charged the jury as follows :

" This case, gentlemen, is an important one, and imposes upon the court and jury duties not only *important* but *onerous*, and the State, as well as the accused, have a right to expect, yea, to

State *v.* McDonnell.

demand of us a *faithful, impartial and independent discharge of those duties.*

The accused stands charged of having killed John T. McKeen . on the night of the 21st day of May last, under such circumstances *as to constitute murder.*

It becomes necessary in the first instance to call your attention to two species of homicide, familiarly known as *murder* and *manslaughter*, and to point out, as clearly as we can, in what they consist, and the distinction between the two offences.

To constitute a homicide *murder*, the killing must be done with malice prepense or aforethought, but this malice may be express or implied ; and when the act is done voluntarily, by the infliction of a wound with great violence with a deadly weapon, and upon a vital part, the malice requisite to constitute murder will be presumed, for the law infers that the natural and probable result of an act deliberately done was just what was intended to be effected by the person doing the act, and the burden of extenuating the offence is cast upon the accused in such a case, and unless such facts are proved on trial by the government witnesses, or by witnesses called by the accused, as would extenuate the homicide and reduce it to manslaughter, the malice would be implied from the act producing the homicide, in a case like this, when the wound was inflicted upon a vital part with violence and with a *deadly weapon.*

When we speak of murder being a *deliberate act*, the *deliberation* does not imply time and reflection ; if it did, a *deliberate act* would never be sudden. If the person killing had time to think, and did intend to kill, though it was but for a moment, it would be a *deliberate, premeditated killing, constituting murder*, as much so as if the deliberation had been for an hour or a day. No time is too short for a wicked man to form in his mind a scheme of *murder* and to contrive the means of accomplishing it ; 1 Hale P. C. note 452 ; 9 Metc. 107.

To constitute the *killing of a human being, murder*, it is not necessary that the person killing should have any special and particular malice towards the person killed. If the killing is attended with circumstances which indicate great wickedness and depravity of disposition, and a heart void of social duty and fatally bent

on mischief, the offence will be murder. For the law by the term *malice*, in the connection in which it may be used relative to the crime of *murder*, means that the commission of the offence has been attended with such circumstances as are the ordinary symptoms of a wicked, depraved, and a corrupt and malignant spirit; Foster C. L.; 1 Hale P. C. 449 note 2; 5 Cush. 304. And in trials of this kind it is to be borne in mind by the court and jury, that a man shall be presumed to intend the natural, probable and usual consequences of his own acts in the absence of evidence to show the contrary. See 9 Metc. 103.

Manslaughter is the unlawful killing of a man without malice, and may be either voluntary, as when the act is committed with a real design and purpose to kill, but through the violence of sudden passion, occasioned by some *great provocation*, which in tenderness to the frailty of human nature, the law considers sufficient to palliate the criminality of the offence; or involuntary, as when the death of another is caused by some unlawful act not accompanied by any intention to take life; 5 Cush. 304. The *characteristic distinction* between murder and manslaughter is *malice express* or *implied*, and we have before said that the implication of malice arises in every case of *homicide* where the fact of killing is proved to have been occasioned by the violent and voluntary infliction of a wound by a deadly weapon upon a vital part which was calculated to endanger life.

If there are in such a case, in fact, circumstances of justification, excuse, or *palliation*, they must come from the *accused* unless they come out from the examination of the government witnesses upon an examination in chief or upon cross examination.

If, then, one person assail another violently with a dangerous weapon, likely to kill, and which does in fact destroy the life of the party assailed, the natural presumption is that he intended death, or some other great bodily harm, unless the presumption of malice is rebutted by some express showing.

If, however, death, though willfully intended, was inflicted immediately after a provocation was given by the deceased, which the law would deem *adequate* to excite sudden and angry passion and create heat of blood, such fact rebuts the presumption of malice.

But still the homicide would be *manslaughter*, it being unlaw-ful, because a man is bound to curb his passions, and if he does not he must answer for the consequences.

What is to be regarded as an *adequate provocation* to *mitigate* and reduce a homicide to manslaughter, which would otherwise constitute murder, is a question upon which it is the duty of the court to give you instructions.

It is a settled rule of law that no provocation by words only, however opprobrious, will *mitigate* what would otherwise be murder, to manslaughter. If, upon provoking language given, the party immediately revenges himself by the use of a deadly weapon, likely to cause death, as the use of a *heavy bludgeon*, an *axe*, or a *knife*, if death ensues, it is a homicide by *malice afore-thought* within the true definition of *murder*, and is not by the circumstances mitigated to manslaughter.

The words " *malice prepense*" or " *aforethought*" in the descrip-tion of the crime of murder do not imply deliberation or the lapse of any considerable time between the *malicious intent* to take life and the execution of the intent. They are used rather to denote *purpose* and *design* in contradistinction to accident or mischance ; 5 Cush. 305. And if a man without justification, excuse, or extenuation, causes the death of another, by the intentional use of a deadly weapon, likely to destroy life, it will be murder, although the assailant only intended to do the person assailed some *great bodily harm*.

The reason is that in such a case he is responsible for the con-sequences upon the principle before alluded to, that he is to be taken to intend the natural and probable consequences of his own act, and consequently must answer for the execution of such intention ; 5 Cush. 306.

To determine whether the killing upon *provocation* amounts to *murder* or manslaughter, the instrument wherewith the homicide was effected must be taken into consideration, for if it was effected with a *deadly weapon*, the provocation must be great indeed to lower the grade of the crime from murder to manslaugh-ter ; if with a weapon not likely nor intended to produce death, a less degree of provocation will be sufficient. In fact the instru-ment employed must bear a reasonable proportion to the provo-

cation, to reduce the offence to manslaughter ; Wharton, sec. 971 ; Wharton 194.

To constitute a provocation sufficient to reduce the offence to manslaughter, it is necessary there should have been a quarrel, and if when one is assailed with *great violence* or *great rudeness*, as by spitting in his face, he is inspired with a sudden impulse of anger which puts him upon resistance before time for cool reflection, and in this situation he attacks his assailant, even with a deadly weapon calculated to endanger life, and death ensues, the act would be regarded as done through heat of blood and violent anger, and not through malice or that cold blooded desire of revenge which constitute the emotion or feeling of a malicious passion ; and in such a case the offence would be reduced to man- slaughter.

But if the provocation is sought by the person accused to be made the occasion of gratifying a vengeful spirit, it will not exten- uate the offence, however grievous such provocation may be, and the homicide would be murder ; Wharton, sec. 971.

So if a homicide occur in *mutual combat* attributable to sudden and violent anger, *occasioned by the combat*, and not to malice, the offence would be but manslaughter, as in a *combat* between two persons, who meet at the same place *not intending to quarrel*, and angry words *suddenly* arise, and a conflict springs up, in which blows are given on both sides, it would be regarded as a *mutual combat* without *much regard* to who was the assailant. But in order to bring the case within the rule relating to mutual combat so as to lessen the crime to manslaughter, it must appear that no *undue advantage* was sought or taken on either side ; Foster, 295. The occasion of this mutual combat must not only be sud- den, but the party first assailed must be upon an equal footing in point of defence at the outset, and this is peculiarly requisite when the attack is made with deadly or dangerous weapons ; 1 East P. C. 242. The true principle is well laid down in Whar- ton, on homicide, page 192. The court then proceeded to tell the jury :

You will, gentlemen, no doubt first consider the case as to McDonnell.

No question can be raised but what McDonnell killed McKeen

on the 21st of May last, and that the killing was an unjustifiable homicide, and the real question is, was it murder or only manslaughter? We apprehend there is no ground to claim that McDounell should be entirely acquitted of the charge against him.

I have not usually been in the habit of reciting the evidence verbatim and with great particularity to a jury, deeming it in ordinary cases not necessary, but in a case of this importance I feel it to be a duty.

Before proceeding further, I will read the minutes of the testimony of Wight, Bliss, Logan and Thayer.

(The court here read the minutes of their testimony.)

From the evidence in the case, the government claim that this is a case not simply of *implied* malice, but a case of *express* malice, and they rely upon having shown that an ill and malevolent feeling existed, especially on the part of McDonnell and Bain toward the deceased.

First, as being evinced from the transaction on the night of the 14th of May at the store door of McKeen.

Second, from the encounter with Mosher.

Third, from the testimony of Johnson.

Fourth from the facts and character of the transaction on the night of the fatal tragedy; from the manner of going to the door and making an assault upon it; from the opprobrious and insulting language used; from their speaking through the keyhole; from the fact that they made no reply to a civil enquiry of McKeen " what they were there for ;" and from the reply to the enquiry, " which it was that came to the door," from the one standing opposite, " supposing it was me, what are you going to do about it," and from the reply to the inquiry, " what you did that for ?" " None of your business, you d—n son of a bitch." Also, from the manner in which they came down and *stopped* and commenced the affray; and also that the affray was sought by the accused to give an opportunity to gratify a reckless and wanton spirit of wickedness or malevolence towards McKeen. *If so*, no provocation or heat of blood would mitigate the homicide to manslaughter. If under color of having a *mutual combat* upon equal terms, one of the parties was possessed of a deadly weapon, unbeknown to McKeen, and that he intended

to use it at the beginning of the affray, and did so use it, and death ensued thereby, *this would be rank murder*, and it is no matter in such a case in what stage of the affray it was in fact used if the intention to use it existed at the beginning of the affray.

The government claim that McDonnell not only intended to, but did in fact use the knife, under color of having a mutual combat upon *equal* terms *at the very threshhold of the parties coming together. If this was so, it is murder.*

This is to be inferred, the government claims, from the proximity of time in which McKeen fell after their meeting, and that no other cause is assignable why he thus fell at the hand of the assassin ; and that nobody saw or heard of any blows between them, or any tripping. If there had been, the government claim that Wight, Bliss and Logan must have both seen the striking and heard the blows, as they were directly in front of the door and the light shining upon them.

There is no evidence in this case introduced to show that there was a scratch or mark on the body of McDonnell. Of course it is the duty of the court and jury, under the circumstances of the case, to presume that there were none. If there had been it is presumable that the respondent's counsel would have introduced the evidence of scratches or marks to show that he had an encounter. And no marks upon the body of McKeen are shown, not even a scratch, save the bruise of the shoulder, occasioned, no doubt, by falling, and what was made by the fatal knife.

It was claimed by the government that the knife was used at the very threshold of the affray, from the manner in which the knife entered the breast bone of McKeen, and from the impracticability that the knife could have been driven through the bone while the parties were in close contact, and that the wound could not have been given while both parties were down.

The wound must, it is claimed by the government, have preceded the fall for the above reasons, and because there was no other adequate cause for this fall. If McDonnell intentionally, without justification or excuse, stabbed McKeen with the knife, and it is found by the jury, that it was a dangerous weapon, and likely to destroy life, and the wound given in a vital part, and with the intention to do McKeen *some great bodily harm,*

without any definite intention to take his life, and that McDonnell, regardless of consequences, so far plunged the knife into the breast bone of McKeen as to occasion his fall upon the knife, by which means it was driven home to its destination, by means of which the death of McKeen ensued, it would be murder, as much so as if it had been done under an actual and declared purpose of taking his life."

The jury were also told that if two persons have a mutual combat on equal terms and there is an interchange of blows, and one of the parties on a sudden, and without any such intention at the commencement of the affray, snatches up a deadly weapon and kills the other party with it, such killing will only be manslaughter.

In regard to the attack made upon Mosher, the court told the jury that that testimony was admitted only upon the ground claimed by the attorney for the government, that he should prove that the attack was made at least by McDonnell and Bain, and upon the supposition and belief that it was the deceased instead of Mosher, and that if they found such was the fact it would tend to show express malice towards the deceased, but that unless they found this, the evidence was to be laid out of the case, and should have no effect, and in determining this they would look to the testimony of Mosher and all the evidence and circumstances bearing upon this point in the case.

As to the effect of the admission of McDonnell, as testified to by Patee, the court charged as follows:

" Where the government introduces the confession of a party accused, the whole must go to the jury, and they may give such credence to the different parts of it under all the circumstances attending the whole case, as they see fit. If they think the whole entitled to credence, they can believe it and give it effect. They are not obliged to believe any part of it, unless they think it to be true. They can give credence to the whole of it, or different parts of it, taking it in connection with all the other evidence connected with the case, or they can disbelieve the whole."

The court further charged as follows:

" The jury are to be satisfied beyond a *reasonable doubt*, that one

or more of the accused are guilty, or they should return a general verdict of acquittal; and if they have a reasonable doubt whether the offence is murder or manslaughter, their verdict should be for the lesser offence."

But it is important to know what is meant by " beyond a reasonable doubt."

All that is meant is, that the jury from the evidence should feel an abiding conviction, to a moral certainty, of the truth of the charge; a mathematical or absolute certainty cannot be and is not required. If there is reasonable doubt the accused should have the benefit of it.

If the doctrine was, that an absolute certainty of guilt was required before a verdict of guilty could be rendered, it might be a convenient doctrine, *and mercy to the guilty*; *but it would be cruelty to the public."* Here the court read from the opinion of Chief Justice SHAW, in the 5th Cushing, p. 320, from the words to the words which is referred to and made a part of this case; and the court told the jury that this was a correct exposition of what was to be understood by a reasonable doubt, and one which the court adopted, and gave them in charge; though the court remarked that some jurists would sometimes tell a jury that such a conviction of a truth as they would think it safe to act upon in the most important concerns of life, would be sufficient for them to act upon in the jury box.

I have a word in regard to the jury being judges of the law, as well as the facts.

That is the theory in some States and governments, while it is denied in others; and to me it is a most nonsensical and absurd theory, but for the purposes of this trial we charge you that such is the law of this State.

But you probably will not think that you understand the law of this case as well as the court.

And you would be *amply* and *fully justified* in relying upon the court for the law that should govern this case, and holding them accountable for that, though they have no wish to court responsibility. If they make a mistake against the accused, it can be corrected by a higher tribunal on exceptions.

State *v.* McDonnell.

If you make a mistake against the accused it cannot be corrected.

You will then, gentlemen, take the case. You have nothing to do with consequences. You are not sworn to look to consequences. Your oath is " a true and impartial verdict give according to the law and testimony given you in court."

In this case as in all others, persons whether convicted of *murder* or manslaughter, or of other crimes, are subjects of *executive clemency* by reprieve or pardon, and may apply to the legislature for a commutation of any sentence the court may be compelled by the existing law to pronounce upon conviction.

You can acquit one or more of the respondents, or all, if the testimony warrants it.

Under an indictment for murder, if that charge is not sustained, but the lesser one is, you can convict of manslaughter.

If McDonnell is guilty and is convicted of murder, the other prisoners, if they were present and aiding, encouraging and abetting him in the commission of that crime, are guilty of the same offence.

If McDonnell is convicted of manslaghter, the other prisoners if found to have been present, aiding, encouraging and abetting him in the commission of the crime, are guilty of the same offence.

Take the case and do your whole duty, and' no more nor less than your whole duty. The accused. gentlemen, are in your hands.

(Note.—Wherever references are made in the charge of the court to authorities, the court read such authorities to the jury.)

To the several rulings of the court above noted, to the refusal to charge as requested and the charge as given, the respondent, McDonnell, excepted.

*Roberts & Chittenden*, for the respondent.

I *The charge as to the confession of McDonnell.*

Taking the admission of McDonnell, as testified to by Pattee, *by itself*, it proved,

1st. That there had never been any " trouble or hard feelings " between him and McKeen before the affray.

2d. That an assault was made upon him, and a blow given by McKeen.

3d. That the knife was taken out "when" (or after) the blow was given.

4th. That the parties then clinched, and that the blow was given just at the close of the struggle.

Couple these facts with the fact that McKeen was the stronger man, and that the knife was the ordinary pocket knife of the respondent, and the offence is thereby modified to manslaughter.

Upon this the respondent asked specific instructions of the court, particularly directed towards restraining the jury from an arbitrary rejection of such parts of the confession as made for the respondent, to give the jury some legal rule for the regulation of their belief and for their finding.

The first request is in the language of the books. "Taking the whole admission together," means something more than that the whole confession must, in the language of the court, " go to the jury as evidence," i. e., be read or recited to them; it means that the whole must be received and believed, or acted upon as true, unless there be in the internal improbability of the relation, or in the other evidence in the case, what convinces the jury that the exculpatory part of the confession is untrue.

The second and third requests are more specific, and are sustained by many cases; Jones case, 2 Carr & Payne 629, 12 C. L. 292, and case before GARROW, B., therein cited; Higgins case, 3 C. & P. 603, 14 C. L. 476, 481 ; Clewe's case, 4 C. & P. 221, 19 C. L. 354; Steptoe's case, *ib.* 397, *ib.* 440, 519 ; *Carver* v. *Tracy,* 3 Johns. 427 ; *Wailing* v. *Toll,* 9 Johns. 141 ; *Credit* v. *Brown,* 10 Johns. 365 ; *Kelsey* v. *Bush et al.,* 2 Hill 440 ; *Newman* v. *Bradley,* 1 Dall. 240 ; *Tipton* v. *The State,* Peck 308, cited in 1 Cow. and Hill's notes 247–8.

*Mattocks* v. *Lyman et al.,* 18 Vt. 98, is not inconsistent with these cases.

The charge upon this point is objectionable in that it left to the jury an arbitrary discretion as to the reception or rejection of the exculpatory parts of the confession. They may give such credence to its different parts " as they see fit." If they " think " it entitled to credence they " *can* believe it," not " obliged" to believe it unless they " *think* it to be true," etc.

State v. McDonnell.

The last sentence of the charge lays down no more certain rule ; for the request is still unanswered, *how* is its connection with the other evidence in the case to affect it?

It is therefore submitted,

1. That the respondent was entitled to the precise charge asked.

2. That the charge as given is loose and uncertain, giving the jury either no rule for their guidance, or a false one.

II. *The admission of the testimony of Mosher, Bliss and Flana gan, and the charge thereupon.*

The testimony of Mosher was admitted upon the claim of the prosecutor, that he should prove that the attack upon Mosher was made by the respondents, and that they supposed him to be McKeen, and that this was the motive to such attack.

If then there was a failure of proof on either point, the testimony went for nothing. Thus, if the attack on Mosher was made by other parties than the respondents, they could not be affected by it. Or if made by the respondents, but *not* on the supposition and belief that it was McKeen, it goes for nothing. and so was the charge ; but we submit, that the evidence did not tend to prove either of these facts. The first was disproved, and there was no evidence to prove the second.

If so, the jury should have been instructed to lay the testimony of Mosher out of the case, and the testimony of Bliss and Flanagan, as to the resemblance of McKeen and Mosher, should have been excluded.

III. *The charge upon the main question.*

The respondent asked only the difference in his behalf between murder and manslaughter.

The theory of his defence is found in the evidence, and he asked only that it should be fairly submitted to the jury.

That theory was this : that no pre-existing or express malice towards McKeen existed or was proved ; that there was no previous preparation for a conflict with McKeen, or intent to attack him ; that he was first assaulted and struck by McKeen ; that thereupon they clinched and struggled, and McKeen being the stronger man was overmastering McDonnell ; that this scuffle continued for from half a minute to two minutes, and that just

State v. McDonnell.

at its close McDonnell dealt a blow with the knife, not fatal, when the knife was driven home by falling upon it; that this knife was the respondent's ordinary pocket knife, not designed, like a dirk or pistol, for the peculiar uses of homicide, and was snatched from his pocket, and used after a blow from McKeen, and a conflict actually commenced, and in the heat of blood excited thereby.

There was testimony in the case tending to support every branch of this theory.*

Such being the theory of the defence, and such the testimony bearing upon it, the respondent was entitled to claim of the justice of the court, that both the theory and the evidence should be not ignored, but presented fairly to the consideration of the jury, with apt instructions.    Not for the purpose of creating an obligation upon the court so to do, but as a guard against a possible omission from carelessness or one sided views, the attention of the court was called to our views by specific written requests, being the 6th, 7th and 8th.

The charge of the court is in three divisions.

1st *A general dissertation occupying two pages of the printed case upon the subject of murder, with copious excerpts from the text books of elementary principles.*

This is, in the main, well enough as a general law lecture, but, without a more specific application to the facts of this case, it is, for the most part, out of the region of present criticism.    We will only notice the two last sentences of the lecture.

If this part of the charge is to be treated as having an application to the facts of this case, as anything else than judicial speculation, the question arises, what is *undue advantage?* Is it not taking an *undue* advantage to kill at all? If not, is it not taking an *undue* advantage to use the means of killing, which one may happen to have about him, although not intended for such use, and being laid hold of in the heat of blood aroused by the combat?

Upon these, and like questions likely to be suggested, the jury received no instructions.   In attempting to answer them for them-

* That portion of the brief of the respondent's counsel in which they proceeded at length to show this tendency of the testimony, is necessarily omitted for want of room.—REPORTER.

State *v.* McDonnell.

selves, the jury would be apt to err.   If they applied the formula to the taking of an advantage "in the heat of blood," it would be clearly an error, (1 East's P. C. 238 )   And this error the charge leaves men free to make.

But the last sentence, if to be applied to the facts of the case, is a glaring misdirection.

As a principle, without limitation, it is false.   It is a misquotation and perversion of the authority cited, (1 East's P. C. 242.)

The authority cited limits the proposition to the case of the party on trial *who made the first assault*.   This is omitted in the proposition as announced by the court.

Now suppose the jury found that McKeen made the first assault, and that McDonnell was " the party first *assailed*," then it is not true, that to reduce the offence to manslaughter McDonnell must have been " upon an equal footing  in point of *defence* at the outset;" an *equal* footing, i. e., neither better nor worse.

If this be so, it would follow, that the fact that McDonnell happened to have a knife in his pocket, at the  commencement of the combat, when McKeen had none, would make McDonnell of necessity a murderer, although McKeen first assaulted him, and the knife was used upon provocation and in the heat of blood excited by the combat.

If it be said that the court read the passage correctly from the book cited, it may be answered that such reading was rather for fortifying the propositions announced in the charge, than as intended to make the authority read a part of the charge, or as modifying it.

2d.  *One page of comment upon testimony and of argument to prove that McDonnell was a murderer.*   Indeed, he is called an *assassin, co nomine.*

This part of the charge bristles all over with italics, like daggers, and drips blood at every sentence.

3d,  *A possible reference to the theory of the defence, embraced in three lines and a fraction.*

But this lone paragraph makes no reference to the requests of the respondent, to the theory of his defence, or the evidence bearing upon it.   All these are ignored.   This was calculated to mis-

lead the jury, and was error; *Parker* v. *Donaldson*, 6 Searg. & Watts 132; *Relf* v. *Rapp*, 3 *Ib.* 21.

This part of the charge is a mere enunciation of an elementary principle, without application suggested to the facts of this case, and so enunciated that if applied by the jury it was sure to mislead them; *Mason* v. *Silver*, 1 Aik. 367; *Gorman* v. *Campbell*, 14 Geo. 137; 14 U. S. Dig. 558, secs. 75, 76.

Thus a combat " on equal terms" is not defined. An "interchange of blows" is made an element. *Snatching* up the deadly weapon is made an element.

This leaves the jury to infer that the combat was not on equal terms, if McDonnell had in his possession an instrument which could be used fatally, although this was his ordinary pocket knife, and was neither designed in its construction, nor intended by McDonnell for such use. Also that the sudden and impulsive taking of the knife from the pocket was something different from the *snatching* up of a deadly weapon.

Where there is no marked disparity in the strength of two parties, the inequality of the terms of combat, spoken of in the books, implies a purpose in advance to resort to the use of a weapon, and not merely that one may happen to be in a more favorable situation than the other, to resort to the use of a weapon after his blood has become heated; Whart. Cr. L., secs. 985, 998; 1 East C. L. 242–3, citing Mawbridge case.

So of the snatching up of a weapon. If the instrument is about the person for honest uses, and is suddenly seized in the heat of blood, it is *snatched* up; and the possession of it cannot be referred to an intent in advance to use it, without other evidence; nor can the man with propriety be said to be armed; BAILEY, J., in Whitely's case, 1 Lew. 173, cited in Whart. Hom. 192; BAILEY, J., in *Rex* v. *Anderson*, 1 Russ. Cr. 531, cited in Whart. Hom. 192 and 193, commencing at the point where Judge BENNETT *stopped* reading.

The respondent was entitled to a charge, applicable to his own theory of the defence, and the facts, as he claimed them to be, if there was any evidence tending to prove them; and this general theorizing and enunciation of abstract propositions, however sound and accurate, do not come up to the requirements of the law as

35

State *v.* McDonnell.

to a charge; *Whitney* v. *Lynde*, 16 Vt, 579 ; *Hazard* v. *Smith*, 21 Vt. 123 ; *Clark* v. *Tabor*, 28 Vt. 222.

4. *The charge as to the jurors being judges of the law as well as of the facts.*

By the law of this State, jurors, in criminal cases, not only have the power, but it is their right *and duty* to judge of and decide the law of the case ; *State* v. *Croteau*, 23 Vt. 14.

This is " a most nonsensical and absurd theory," quoth the judge.

As a question of taste and judicial propriety, there can be but one verdict as to this attempt of, the judge to fly-blow the estab-lished law of the State. But it is more than a venial violation of judicial decorum ; the charge contains revisable error.

If in the distribution of the political powers of the State, this power is devolved upon jurors, as a branch of the courts, thus giving a right and so imposing a duty to determine the law, a responsibility is created which they cannot shuffle off upon the judge.

Of necessity, they must exercise their own judgment as to the law, with such aids as the arguments of counsel and the charge of the judge may afford; but inasmuch as it is their own judg-ment that must decide the law, they cannot be "*justified* in rely-ing upon the court for the law," when the conclusion of their judgment is that the charge of the judge is not the law.

The jury are not more exclusively the judges of the facts in civil cases, than of the law in criminal. Now although in civil cases the judge may, if he pleases, give his views as to the facts, it would be clearly error to charge them that he probably better undertood the facts than they, and they would be " *amply* and *fully justified* in relying upon the court for the *facts* which should govern the case." Nevertheless by the law of this State they were judges of the facts, yet " a most nonsensical and absurd theory."

We submit that it is an error revisable if the judge shall, from mere persuasion or suggestion, induce the jury to go wrong, or to absolve themselves from responsibilities which the law casts upon them; REDFIELD, J., in *Stevens* v. *Talcott*, 11 Vt. 30 ; *Ben-ham* v. *Corey*, 11 Wend. 83.

*E. R. Hard*, State's attorney, for the prosecution.

State *v*. McDonnell.

REDFIELD, Ch. J. I. The first objection made to the fairness of the trial in the court below, and which seems to be regarded by the prisoner's counsel as showing, to some extent, that the *animus* of the whole was unfavorable to their client, is the alleged terms of disrespect in which the judge made allusion to that rule of law now recognized in this State, that the jury may judge of the law as well as the fact, in criminal cases. Any attempt on the part of a judge, in the trial of an important criminal case, to prejudice the jury against an established rule of law applicable to all cases, or to the particular case, would very justly expose him to severe criticism. But we do not feel that such is precisely the present case.

The rule of law referred to is strikingly peculiar, as applicable to jury trials. Where the judge and jury are both required to assume their distinct and proper functions, the one of the law, and the other of the fact, it will scarcely be claimed to have any just application to ordinary cases. It surely will not be claimed that the object and purpose of the rule is to enable ingenious and eloquent counsel to procure the acquittal of guilty persons, by inducing juries to put a misconstruction upon the law, in opposition to the charge of the court. Nor that the jury are really more competent judges of the law than the court are.

The most which can fairly be claimed in favor of the rule is, that it is one of those great exceptional rules intended for the security of the citizen against any impracticable refinements in the law, or any supposable or possible tyranny or oppression of the courts. It has always been regarded as belonging rather to the department of governmental polity than to that of jurisprudence, in the strict sense of that term, and in that view is more justly considered a political than a legal maxim.

It has indeed been claimed, as one of those great landmarks, defining, and intended to secure the enforcement of English liberty, which, although always more or less in conflict and dispute, between the advocates of prerogative on the one hand, and of the largest liberty of the subject on the other, in that country, from which we in fact derive the principle of the rule; and which, because it is an exceptional rule, will always be likely to be characterized as an absurdity by the mere advocates of logical sym-

State *v.* McDonnell.

metry in the law, will nevertheless be sure, in the long run, to constantly gain ground, and become more and more firmly fixed in the hearts and sympathies of those with whom liberty and law are almost synonymous, and may therefore be regarded rather as an instinct, or a sentiment, than a mere logical deduction. It is therefore not a thing to be much reasoned about. It is a power, perhaps, more strictly than a right, in its primitive existence, but such a power as would be less likely to be wrongly exercised by juries when it was conceded, than if kept in perpetual conflict by occasional and sometimes acrimonious denials on the part of the court.

It is upon this ground that I, for myself, long before the distinct recognition of the rule by this court, in *State* v. *Croteau,* 23 Vt. 14, came to the conclusion that it was best, as a matter of prudence, not to allow the question to be brought into contest between the court and juries. Let juries feel that they have the power and the right to judge of the law in criminal cases, over the heads of the court, and that they may do this in all criminal cases, if they choose to take the responsibility, and in practice it will be found that they will not do it, except in extreme cases. And in such cases it is perhaps proper enough that they should do it. Judges are liable to their full share of infirmity and error, and courts of the last resort will sometimes fall into errors of so grave and serious a character as to require the modification of the common sense instincts of the more unsophisticated. This, in civil cases, is well enough left to the interference of the legislature, but in criminal cases, affecting life, or character, or liberty, such a resort would come too late.

But we see no objection, where the interference of a jury is directly invoked in a criminal case, to the judge stating to the jury, in his own way, that this rule is not intended for ordinary criminal cases; that it is matter of favor to the defendant, and should not be acted upon by the jury, except after the most thorough conviction of its necessity and propriety; that any departure by the jury from the law laid down by the court, must be taken solely upon their own responsibility; and that the safer, and better, and fairer way, in ordinary criminal cases, is to take the law from the court, and that they are always justified in doing so.

This is substantially what was done by the court below, and we see no just ground of exception to the mode in which it was done. The declarations of the judge were explicit, and characterized by directness and plainness of speech, and this is, in general, a desirable quality in a charge to the jury. It may be carried too far, and thus become objectionable, like every good thing in excess, but it does not occur to us that this portion of the charge was specially objectionable on that ground. Men will differ in their views as to the best manner of dealing with such delicate questions between the court and jury. Perhaps the surest mode of keeping the jury within their proper functions is for the court not to trench upon their own peculiar province, and not to evince any suspicion that they will not reciprocate the courtesy. I think the more common fault of juries is to strive, by disagreements, or in some other mode, to escape the necessity of taking their own just share of the responsibility, rather than to usurp the proper province of the court This is undoubtedly the more common fault with us all in important trials.

II. The mode in which the defendant's confession was put to the jury might be liable to misconstruction, no doubt. The jury were told that it must " go to the jury as evidence, and they might give such credence to the different parts of it, under all the circumstances attending the whole case, as they saw fit." It is claimed that this last expression might, naturally enough, be understood by the jury as giving them an arbitrary discretion to use only that portion of it, in making up their verdict, which made against the defendant. It is certainly not probable the jury would have so understood the charge. And as we are bound now, while revising the case upon error, to make all reasonable intendments in favor of the proceedings below, we shall hardly feel justified in opening the case upon this ground alone. We may refer to this subject again.

But, to guard against possible misapprehension, it is proper to add here, that in cases of such magnitude, where the State resort to the confessions of the defendant, as evidence against him, it requires that considerable care be used by the court, lest, either in the mode of obtaining or the use made of such confessions injustice be inflicted upon the accused. The general public senti-

State *v.* McDonnell.

ment upon the subject, that there is no danger of one suffering from his own confession, although natural and commendable, as evincing a desire not to have the guilty go unpunished, is certainly not based either upon sound logic or wise experience.

From the general rule, known to all, that the declarations of one accused of crime are not evidence in his favor, but are evidence against him, a common jury might not unnaturally come to the conclusion that the same rule should apply to the different portions of his confession, as it is called, when used in evidence against him. And it must be admitted that although the charge upon this point is sufficiently guarded against such misapprehension, when viewed in the light of the legal rule upon the subject, yet when interpreted by the popular sentiment upon the question, it is quite susceptible of being so understood as to countenance that acceptation. The case did seem to require that the jury should be made fully to comprehend that the declarations of the defendant in his favor were the conditions upon which those against him rested, and if used as evidence against him, he might fairly insist upon the conditions being maintained in his favor, unless disproved either by the other circumstances, or testimony in the case, or their own innate improbability or inconsistency and absurdity. The refusal of the court to respond to the request to give more definite instructions upon this point, was calculated to impress the minds of the jury in favor of a strict construction of those declarations of the defendant, which tended to exculpate him, and a more liberal one of those which made against him. And the failure of the judge, in summing up, to allude to this confession, as containing any possible circumstance of exculpation, would tend very much to confirm the jury in any impression they might have that it was not to be weighed in that direction. From all which it is obvious that if the charge was not positively erroneous on this point, it certainly was not so fully guarded against misconstruction as was desirable.

III. In regard to Mosher's testimony, the only question made is, whether it should have been suffered to go to the jury in the final summing up. This will undoubtedly strike different minds differently. If there was really any uncertainty in regard to the defendant having made the assault upon Mosher, as there was

confessedly very considerable doubt whether the person making the assault could have mistaken Mosher for the deceased, Mc-Keen, the two uncertainties combined would increase the doubt in a compound ratio, and thus render this testimony too indefinite to go to the jury at all. One gets a far more vivid, and generally a more correct apprehension of the true force of such circumstances, from hearing the whole trial and argument upon the facts. I should hesitate, therefore, to speak with perfect confidence upon a matter of this kind, so as to open a case for new trial upon this ground alone, until I had taken time to so study the case in detail as to impress all the facts upon the memory in such a way as to be able to view each particular fact and circumstance in all its relations to the other facts and circumstances of the whole case, and thus feel sure I could comprehend its true bearing and force, both positively and relatively. My present impression is, that, in a case affecting life, testimony of this loose and unsatisfactory character ought to be wholly excluded from the consideration of the jury in the final summing up. It could not properly have been excluded upon the offer made in connection with this proof. But if, when all the evidence was in, the theory upon which it had been received was not sustained by any evidence, but rested in mere possibility or conjecture, about as likely to be false as true, the consideration of the evidence should not have been allowed to the jury. But this point is not intended to be definitely decided; it strikes the members of the court differently.

IV. But the most serious ground of complaint, in regard to the trial in this case, seems to us to arise upon the charge affecting the general nature of the offence.

1. The practice of reading books to the jury, in the manner and to the extent it seems to have been done in this case, affords a most significant commentary upon the general theory of making juries really attempt to settle the law, upon their own responsibility, in the ultimate decision of every criminal case, the same as they do the facts. One might almost as well, for any purpose of actual enlightenment, give the jury general treatise upon criminal law, and tell them the whole law applicable to the case would be found under the title homicide, or manslaughter and murder.

State *v.* McDonnell.

It is unquestionable that a common jury are, from their general habits of study and reflection, quite incapable of so comprehending general abstract propositions of law, read consecutively from a book, as to make any safe and judicious application of them to the facts of a particular case, and especially a case of this character. But we are aware that this is often done in those States where the courts of last resort have trials for murder before them in banc, and formal opinions upon the law are expected to be given, and this is of necessity done in the presence of the jury; but the formal opinion of the court upon the law is intended rather for the profession, and the published reports, than for the enlightenment of the jury. That must be done after the general principles of the law of the case are settled, by applying them to the particular facts attempted to be proved in the case.

2. We do not understand that the law read from the books in this case was intended to qualify the general propositions laid down in the charge; but that it was read merely in confirmation of what is contained in the charge. It is intimated, in the argument for the prosecution, that if the general propositions laid down in the charge are erroneous, or require qualification, this court will look for that in the books there referred to. This we clearly could not do without knowing, with certainty, what particular portions of the books referred to were read to the jury. This we have no means of determining, as the passages are neither copied into the charge nor definitely described, so as to be capable of identification. It is obvious, from the blanks left, that it was at one time the intention of the judge to do so, but it has not been done, and we cannot now do it. The charge must therefore be taken as it stands upon the bill of exceptions.

3. This seems very correct in the main. But mere abstract propositions of law, whether read from a book or not, afford but an imperfect guide to a common jury in the determination of a complicated case. The most learned, experienced and correct judges often misapprehend the proper application of general principles of law to the facts of a particular case. That is the principal uncertainty which arises in the trial of causes. It is not often that the counsel, in a case of this character especially, differ much as to the principles and rules of law applicable to the

State *v.* McDonnell.

eral subj•••. The general definitions of murder and manslaughter have bee… ••••ll settled for centuries. The only uncertainty arises in regard ,•• the application of these recognized and familiar principles to 1 ••• ever varying facts and circumstances of particular cases as tl •••y arise, no two of which are precisely alike, or ever will be, an•i most of which are infinitely varied, in particulars more or les • important, from every adjudged case in the reports.

4. There i• one marked feature in this charge which, in any view we ha• ; been able to take of the case, seems to us incurable. The entire the•••y of the defence, with the exception of a single sentence in th• .harge, which had no natural or just application to the facts o' •i• case, is studiously and strenuously denied and disregarded. 1•• only sentence in the charge, after the judge leaves the gen •n• prefatory propositions and enters upon the particular case, ir • •'ich the distinction between murder and manslaughter is br• •••• into view before the jury, was certainly not framed with an• •• • to the particular case. It is taken verbatim almost from Wh••••••• on Homicide, page 192, and refers to the case of *Rex* v. *Ande1* • 1 Russell on Crimes 531, and is therefore solely applicable •• another case, and by consequence is the same as a mere abstrac•••••. so far as this case is concerned. It has then no just and proper application to the facts and circumstances of this particular case. It is in fact, as it seems to us, even more objectionable, on some accounts, as applied to this case, than an entire omission; for if the jury attempted to apply it to this case in any literal sense, (and they are not, in my judgment, required or supposed to be capable of any other except a literal application of the law given them to the particular case, and it is therefore the duty of courts, in their instructions to juries, to make the law applicable to the particular case, and not to deal in mere abstractions;) if then the jury attempted to make any such application of this portion of the charge to the facts of this case, it certainly must have led them to the conclusion that there was nothing in the case tending to show that the offence might have been manslaughter. And this was unquestionably the view taken of the case in the court below, the only one which makes ` charge consistent and reasonable. But we think this view,

although strongly supported by much of the evidence, is not maintainable as the only view to be taken of the case.

5; We will, therefore, examine the case upon its merits, as presented in the facts detailed upon the bill of exceptions

The principal point of inquiry, as affecting the merits of the trial, is the evidence tending to show that the offence might have been only manslaughter. This is the important and proper point of inquiry in all cases of this character, since it is the duty of the court, upon common principles of humanity and justice, first, to pronounce the criminal innocent until he is proved guilty; and, secondly, after he is shown to have committed a homicide, to look for every excuse which may reduce the guilt to the lowest point consistent with the facts proved. There is, in the present case, still further reason for directing inquiry towards this point, inasmuch as we have seen that the county court evidertly did not feel justified in giving the prisoner the benefit of any such construction of the evidence as would reduce the offence below the grade of murder.

We need not inquire, in regard to the law of homicide, further than the facts in this case seem to require. Some question is made in the argument in regard to the *prima facie* presumption of malice, resulting from the mere fact of death, by the hand of the accused. It does not seem important here to discuss that question, as the proof shows the manner of the death. There is no doubt that such a rule as that laid down by the court in this case, that the law implies malice from the killing with a deadly weapon, and thus imposes upon the accused the burden of showing the contrary, has long been recognized in the courts both of this country and England. The rule is thus expressed in 1 Hawkins' P. C. 82, ch. 131, sec. 32, " That wherever it appears that a man killed another, it shall be intended, *prima facie*, that he did it maliciously, unless he can make out the contrary, by showing that he did it on sudden provocation," etc , citing Kelyng's Reports of Crown Cases, temp. Charles 2, 27. The same general proposition is substantialy repeated in all the subsequent treatises and reports where the question has arisen ; but it seems to have been done without much examination, and one might be

€

State *v.* McDonnell.

allowed to question its application to the mere fact of killing, since, being but a presumption of fact, in the absence of all evi-dence in regard to the mode of death, the presumption of inno-cence must be allowed to prevail over that of malice. But the mode of inflicting death often indicates, with more or less force, the motive and the probable degree of deliberation. Killing by poison clearly indicates malice, where the poison is given in such quantities as ordinarily to produce death. The same may be said when death is produced by resort to a deadly weapon, upon a vital part. This results from the presumption stated in the charge, that one intends the natural consequences of his acts. We see, therefore, no ground to complain of the rule, as qualified by the judge in this case. This is undoubtedly one of those points where the jury should be expected to judge for themselves, as it is a subject which they understand as well as the court, since it has reference to matter of fact, rather than of law. And where a rule of this character is attempted to be applied to a case to which it was never intended to have any application, as, for instance, to the mere fact of killing, as the rule, as laid down in Hawkins and in most of the treatises, might be made to apply, it must be, in my judgment, eminently suitable and proper that the jury should be allowed to test the force of the rule, as laid down by the judge, even by the application of their own experi-ence and common sense instincts, to the rule itself. I should never question the right of a jury to revise, in criminal cases, any question of law so entirely within the range of their own knowledge and experience. One could scarcely be expected to find a verdict upon a rule of law, where his own conscientious convictions were so capable of a direct application to the rule, and where it did violence to the common experience of mankind. But it is not often, perhaps, that a rule of law is susceptible of so clear and narrow a ground of trial, or that it is so much at variance with common experience as to infer malice, from the mere fact of killing. But in the present case the wound indicated malice, whereas, if the deceased had died by the fall itself, with-out the stab, the natural presumption would have been the other

The first clear point in this case, established by almost the

entire testimony, is that it was a case of conflict, or mutual com-bat, at the moment of the encounter. We leave out of question here all evidence of previous malice. At the time nothing had occurred, or was occurring, which called for forcible interference on the part of the deceased. The rattling of his door, and the ribald speeches connected therewith, had ceased. The accused was quietly passing along the sidewalk. He was questioned in regard to what he had done, or why he did it. He made an eva-sive and insulting reply. But this gave no occasion for McKeen to interfere forcibly. But the witnesses all concur that he did advance to meet the defendant, that he met him about half way. The witnesses could not say which moved the swiftest; thought the defendant did, but not sure. They were about six feet apart when both advanced, and met about half way. This is certainly not an attack solely on the part of the prisoner. He may have been, and probably was, the remote cause of the conflict; but it seems probable enough, from all the testimony as to the mode in which the encounter began, that McKeen might have avoided it if he had so chosen.

Being, then, a case of mutual combat or conflict, it does not appear very clearly which struck first. Both seem to have been in a state of preparation for the encounter; the witnesses so describe McKeen: Each, it may be fair to conclude, intended to strike first, and to disable his adversary, so as to put him out of the combat or bring him to terms. The confession of the defend-ant attributes the first blow to McKeen. In a case of mutual combat, it does not seem to be regarded as important to the char-acter of the homicide which did give the first blow. The *prima facie* presumption in regard to all such encounters upon equal terms is, that neither intends to kill or do grievous bodily harm to the other. But if there is evidence of a murderous intent at the time of beginning the affray, the homicide will be murder. It is upon this ground that the law places stress upon the parties being upon equal terms in the beginning of the conflict; for if one take a deadly weapon into the affray with the design of using it in the fight, and especially if this be unknown to the other party, it will afford strong evidence of malice. Hence, if a man draw his sword before the other has time to draw, and thrust his

antagonist through the body, whereby he dies, it is murder, for it shows a purpose of killing, in the first instance.

3. But in this part of the case we do, as we said, lay out of the account all evidence of previous malice; for if that be shown to the satisfaction of the jury, and that the prisoner sought the encounter for the purposes of revenge and punishment of the deceased, although he might not have intended to take his life, it is nevertheless murder when death ensues. And this is said to be the result, although in the fight the assailant " be driven to the wall, and there kill his antagonist in self defence," because he is " guilty of murder in regard to his first intent;" 1 Hawkins' P. C. ch. 31, sec. 26, citing Hale's P. C. 47; Kelyng, 58, 129.

4. But I understand the true rule, as to *bona fide* cases of mutual conflict, is well laid down in 1 Hale's P. C. 456, citing Foster, 297. That although bare words are not such provocation as to lessen the crime to manslaughter, " yet, if A gives indecent language to B, and B therefore strikes A, but not mortally, and then A strikes B again, and then B kills A, that this is but manslaughter, for the second stroke made a new provocation, and so it was but a sudden falling out; and though B gave the first stroke, and after a blow received from A, B gives him a mortal stroke, this is but manslaughter, according to the proof; *the second blow makes the affray.*"

5. If, then, the jury should regard this as a *bona fide* case of mutual combat, without previous malice on the part of the accused, and that mutual blows were given before the accused drew his knife, and that he then drew it in the heat and fury of the fight, and dealt a mortal wound, although with the purpose of doing just what he did do, that is, of taking life, or what would be that intent if he had been in such a state as properly to comprehend the nature of his act, still it is but manslaughter.

6. Although, therefore, it must be admitted that so mortal a wound, inflicted with such a weapon upon so vital a part of the person, upon such slight provocation, must always excite in the mind of the thoughtful and considerate, strong apprehension that it did result from a murderous purpose; yet it seems to us that there was a good deal in the case calculated to impress the minds of the jury with a more favorable construction towards the

defendant, and that it should, therefore, have been submitted to them with instructions applicable to the particular facts.

1. It was clearly a case of mutual combat, and continued for such length of time that mutual blows might have been, and probably were given.

2. The defendant's declarations, given in evidence by the prosecution, all of which are made evidence, was that McKeen gave the first blow, having previously used insulting language.

3. The knife, by which the mortal wound was inflicted, is not shown to have been one which the defendant did not ordinarily carry about him. It appears to have been one in constant use about his business, and, very likely, might have been constantly carried about his person.

4. There is no direct proof when it was drawn, or with what specific intent. That is matter of inference, in regard to which there is undoubtedly room for debate.

5. The medical testimony appears to my mind to favor the conclusion that the fatal character of the wound might have been caused by the fall. If the construction of the principal medical witness is entirely correct as to the suddenness with which death would ensue, and especially the absolute incapacity of the wounded person to continue the struggle, or even to speak, after the full penetration of the knife into the heart, it would seem almost certain, from the other testimony, that the conflict must have continued a considerable time, long enough for the exchange of blows, before the knife was resorted to, and that when first struck it only penetrated into the breast bone, not reaching the heart, and probably not reaching the large nerve named, and that it was thrust through to its fatal result by the fall. It is not improbable that further examination and reflection may somewhat qualify this theory in the opinions of the medical witnesses. It seems to me, however, scarcely possible that so fatal a wound could have been inflicted to the full extent, until the very close of the affray. The time of inflicting the wound is important chiefly in reference to another question, the existence of a previous purpose of using the knife in the combat; for if that point is established against the defendant, to the satisfaction of the jury, it makes the homicide a clear case of murder.

State *v.* McDonnell.

The strongest point against the defendant, in this view of the case, arises from the improbability of his being able, in the very short time which elapsed during the affray, and in so heated a contest, to have drawn and opened his knife. But if the spring of the knife were moderate, or considerably worn, this might possibly be done with more facility than is now altogether obvious to us. At all events it is a point which the defendant has the right to have the jury consider, with every other question of fact, or circumstance, or inference, or probability, in his favor, none of which seem to us, so far as the defence is concerned, to have been properly submitted to their consideration at the trial. And unless we could fairly say that there was no testimony in the case tending to reduce the crime to manslaughter, we could not feel justified in passing sentence of death, until that testimony had been fully submitted and fairly weighed and determined by the jury, whatever we might think of the probable result. That is not a question here.

It seems to me, that if the jury should not find the fact that previous malice existed on the part of the prisoner towards the deceased, of a character which induced him to seek the quarrel, or that he went into the affray with his knife drawn, or with the intention of using it, or thinking of it as a possible resort in case of convenience, to be used in the affray; but that his drawing and using it was altogether an afterthought, subsequent to the encounter, it must be regarded as a case of manslaughter. In this view of the case it must be altogether conjectural whether the defendant would conceive the idea of killing at all; and if he did, in his blind fury, it could not fairly be presumed to have been done with any such deliberation as to constitute murder, unless there is some distinct evidence of more coolness than ordinarily exists in such cases. This is the doctrine laid down in the books, and it corresponds with my own experience in the trial of a considerable number of cases of homicide, in cases of mutual contest. There will be likely always to be such evidence of heat of blood as to render it too doubtful, in regard to the existence of deliberate malice, to allow the jury to convict of murder, unless upon distinct and satisfactory evidence of previous malice.

In every other view the case wears very much the aspect of

murder.`  For the rule laid down by the  court, that if the design
to kill were formed deliberately, for ever so short a time  before
the infliction of the mortal wound, or if it were formed without
such provocation as the law regards as sufficient justification for
anger and heat of blood, that is, upon mere words, however pro-
voking, and before a blow were given by the deceased, the offence
is murder, is undoubted law.   And if one inflict a mortal wound
with a deadly weapon, like a sharp knife, upon a vital part, as in
the present case, it is a presumption of fact that he did  design
the natural consequences of his act; and it is murder, unless  he
shows that the result was not designed, or it was done in heat of
blood, upon legal provocation.

So, too, if the prisoner went to this store with the  purpose of
drawing the deceased into a fight, and then after he had succeeded,
resorted to the use of a deadly weapon upon a vital part, and
death ensued, it is a fair presumption of fact that he intended to
take life in the outset, either absolutely, or, if it became neces-
sary in order to overcome the deceased, and in either case it is
murder.

So, too, on the other hand, if the prisoner went there  without
any thought of a fight, or entered the fight without any thought
of using his knife, and after receiving a blow or blows, got so
heated in his blood as to be incapable of acting with delibera-
tion, and having no deliberately formed feelings of malice or
revenge, seized upon the first weapon he could lay hold of, and
that happened to be this knife, and dealt the mortal blow, although
in his mad fury he struck where he supposed he should most dam-
age his adversary, it is still but manslaughter ; even if the jury
should think the defendant intended to kill, or did that in his
madness which he must have supposed would kill, if he were
capable of estimating consequences.

In this view, the point of time and the  manner of inflicting
the mortal wound is of great importance to be considered by the
jury.   And it will be affected to a considerable extent by a con-
sideration of the length of time the conflict continued, what was
done, whether this could have been done after the fatal wound
was inflicted, or how much of it could have been done after that.
It will of course not escape the consideration of a jury, in this

connection, that the mere estimate of time, by witnesses under such circumstances, is proverbially imperfect, and very liable to seem, many times, longer than it is. This will be corrected by the comparison of different estimates, and more especially by the particular acts which transpired.

The law of manslaughter is very] correctly defined by Chief Justice SHAW, in Webster's case, 5 Cush. 295. "Manslaughter is the unlawful killing of another, without malice, and may be either voluntary, as when the act is committed *with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation,* which in tenderness for the frailty of human nature the law considers sufficient to palliate the offence; or involuntary, as when the death of another is caused by some unlawful act, not accompanied with any intention to take life." "Every man, when assaulted with violence or great rudeness is inspired with a sudden impulse of anger which puts him upon resistance before time for cool reflection, and if during that period he attacks his assailant with a weapon likely to endanger life, and death ensues, it is regarded as done through heat of blood, or violence of anger, and not through malice or that cold blooded desire of revenge which more·properly constitutes the feeling, emotion or passion of malice."

From all we have said it will be obvious that the first point of inquiry before the jury, will be in regard to the existence of pre-conceived malice on the part of the defendant, before he went into the combat. In this view, the nature and character of the wound, and the manner of its infliction, will have an important bearing.

This being got over, the second leading inquiry will be as to the existence of any legal provocation, such as a blow or blows inflicted by the deceased, and the occurence of hot blood in consequence. The defendant having established the negative of the former, and the affirmative of the latter, or rendered them fairly doubtful in the estimation of the jury, will be entitled to claim a verdict of manslaughter, otherwise he is guilty of murder, from the nature, extent and consequence of the wound.

The verdict is set aside and a new trial granted.